799 A.2d 406

**MONTGOMERY COUNTY, Maryland**

v.

**George R. SMITH.**

**No. 00764, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

June 3, 2002.

Sharon V. Burrell, Principal Counsel (Charles W. Thompson, Jr., County Attorney and Christine M. Collins, Assistant County Attorney, on the brief) Rockville, for appellant.

Kenneth M. Berman (Shannon O. Bittinger and Berman, Sobin & Gross, LLP, on the brief) Gaithersburg, for appellee.

Argued before SALMON, KRAUSER, GREENE, JJ.

SALMON, J.

The issue we must decide is whether an injury, which an off-duty prison guard suffered while playing basketball at the detention center where he worked, arose "out of and in the course of [his] employment," as that phrase is used in the Workers' Compensation Act. See Md.Code Ann., Lab. & Empl. § 9–101(b)(1) (2001). The answer to that question basically turns on whether Smith's injury was "sufficiently work-related to be an incident of employment." *Mack Trucks, Inc. v. Miller*, 23 Md.App. 271, 274, 326 A.2d 186 (1974). We shall hold that it was not.

## I. *FACTS*

On February 3, 2000, George R. Smith ("Smith") was employed by Montgomery County as a correctional officer at the County's detention center located in Rockville. The detention center has a gymnasium built for the use of the detention center's inmates. Nevertheless, employees of the detention center are permitted to use the gymnasium when they are off-duty so long as inmates are not using it. Gymnasium use by off-duty employees is neither encouraged nor discouraged by the County.

About 4:30 p.m. on February 3, 2000, Smith, while off duty, was playing basketball [1] in the detention center's gymnasium. In the course of this activity, he jumped, landed awkwardly, and injured both of his knees. He missed the next three months from work due to his injuries.

Smith filed a claim with the Maryland Workers' Compensation Commission ("the Commission") against the County, in which he sought compensation for injuries suffered on February 3. The only issue presented to the Commission was whether the injury "arose out of and in the course of" Smith's

---

[1]. The record does not indicate whether Smith was playing in a full-fledged basketball game, as opposed, for example, to just "shooting baskets." The record does show that fellow correctional officers were also on the court when Smith was injured.

employment. The Commission ruled in favor of Smith and ordered the County to pay Smith's medical expenses, plus $427 per week for the period between February 3 and April 30, 2000.

The County filed in the Circuit Court for Montgomery County a petition for judicial review. After the parties conducted discovery, Smith and the County both filed motions for summary judgment. Movants each claimed that there was no dispute as to any material fact concerning the issue of whether Smith's injuries arose out of and in the course of his employment.

Smith filed an affidavit in support of his motion, in which he averred, *inter alia,* that the reason he was playing basketball on the date in question was "to maintain the high level of physical fitness required ... [of] a corrections officer." He also said in his affidavit that, "on several occasions" prior to the accident, shift commanders had joined correctional officers in the gymnasium and had also played basketball.

Smith attached to his motion several pages from the Montgomery County Department of Corrections and Rehabilitation Departmental Procedural Manual ("the manual"). The manual classified uniformed correctional officers, such as Smith, as "Medical Group I." Group I officers were required to have "an extraordinary degree of physical fitness and mental health." Group I employees in Smith's age group (he was thirty-one when injured) were also required to have complete periodic medical examinations "not less than" once every three years.

The County supported its summary judgment motion with an affidavit by Richard Tegethoff, Deputy Warden of Custody and Security at the detention center where Smith worked. In his affidavit, Warden Tegethoff said, *inter alia:*

[C]orrections officers, including George R. Smith, are required to undergo a physical examination prior to being hired and periodic physical examinations thereafter, but are not subject to any further mandatory physical fitness tests, and physical ability is neither regulated nor evaluated after being hired.

... [W]hile it is desirable that corrections officers maintain a general state of good physical fitness for the safe performance of their job duties, the Montgomery County Department of Corrections neither promotes nor discourages participation in physical fitness activities.

Smith's counsel filed a memorandum opposing the County's summary judgment motion, in which he argued:

Here, ... [Smith's] injury arose out of and in the course of his employment, because [he] is a corrections officer *on call twenty-four (24) hours a day. At any time during one of the games, the [a]ppellee could have been called to duty and would have been required to stop playing and respond.* Also, the Montgomery County Policy and Procedures Manual requires that correctional officers maintain *extraordinary* physical condition to continue in the position. *Lastly, at the time of his injury, the [a]ppellee was training to meet fitness standards to become part of the [a]ppellant's elite "Emergency Response Team."* The fitness standards for this team were established in a [m]emorandum from [Smith's] supervisor, Richard Tegethoff, the individual that signed the [a]ppellant's late filed affidavit (*see* Exhibit A). The fitness standards required are extremely high level of cardiovascular and physical strength conditioning. Mr. Tegethoff's [m]emorandum was issued on February 2, 1999 (the day before the [a]ppellee's injury),[2] and the deadline to meet the standards for the Emergency Response Team was in March 1999 (approximately one month later)! Clearly, peak physical fitness was a requirement of [Smith's] job, and it was while trying to achieve this level of physical fitness that [he] injured himself.

(Emphasis added.)

The portion of counsel's argument that we have emphasized was not supported by affidavit and is not shown to be true by

---

**2.** The injury actually occurred on February 3, *2000.*

any document in the file; it therefore should have been disregarded by the motions judge. *See* Md. Rule 2–311(d).[3]

After hearing oral argument from counsel, the court granted summary judgment in favor of Smith and denied the County's motion. The motions judge explained why in her oral opinion:

> What I have to determine is was the Commission correct. There is a presumption of correctness in the Commission's findings.[4]

> I find that Mr. Smith as a correctional officer was playing basketball after hours at the detention center on the premises with the consent and knowledge of the employer.

> I also find that it is a benefit to the employer in the special situation of a detention center to have extra guards so near and available in case there is a problem. That is an extra benefit to the employer, so I will sustain the finding of WCC [Workers' Compensation Commission].

There was nothing in the record to support the "findings" of the court set forth in the last-quoted paragraph.

## II. *ANALYSIS*[5]

### A. *The Distinction Between and Definitions of "Arising Out of" and "In the Course of Employment"*

In order for a worker's injury to be compensable, it must be shown that he or she suffered an "accidental personal injury."

---

3. Maryland Rule 2–311(d) reads:

 **Affidavit.** A motion or a response to a motion that is based on facts not contained in the record or papers on file in the proceeding shall be supported by affidavit and accompanied by any papers on which it is based.

4. No presumption of correctness should have been applied because there is no presumption of correctness as to the Commission's legal determinations. *See Dixon v. Able Equip. Co.*, 107 Md.App. 541, 545, 668 A.2d 1009 (1995) (the presumption applies only to the Commission's findings of fact, not conclusions of law).

5. The standard for appellate review of a trial court's grant or denial of a motion for summary judgment is whether the court was legally correct.

Included in the definition of an accidental personal injury is an accident *"that arises out of and in the course of employment."* [6] *See* Md.Code Ann., Lab. & Empl. § 9–101(b)(1) (hereafter "L.E.") (2001) (emphasis added).

The Court of Appeals, in *Knoche v. Cox,* 282 Md. 447, 453–56, 385 A.2d 1179 (1978), discussed, in detail, the difference between "in the course of employment" and "arising out of employment." Only if both conditions are satisfied is the injury within the operation of the Act. *Id.* at 453, 385 A.2d 1179 (citing *Perdue v. Brittingham,* 186 Md. 393, 402, 47 A.2d 491 (1946)).

■ Nevertheless, as Professor Clifford Davis observed, "where an injury clearly 'arises' from the employment, the 'in the course' requirement may be relaxed, and where the injured employee is squarely 'in the course' of employment, the arising requirement may be relaxed." Clifford Davis, *Workmen's Compensation in Connecticut—The Necessary Work Connection,* 7 Conn. L.Rev. 199, 201 (1974) (citing Malone, *Some Recent Developments in the Substantive Law of Workmen's Compensation,* 16 Vand. L.Rev. 1039, 1050 (1963)). *See also King Waterproofing Co. v. Slovsky,* 71 Md.App. 247, 252 n. 4, 524 A.2d 1245 (1987) (citing 1A A. Larson, *Workmen's Compensation Law* § 29.00 (1985)).

---

*Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993). "Summary judgment is appropriate only where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Huffman v. Koppers Co.,* 94 Md.App. 180, 184, 616 A.2d 451 (1992).

6. Also included in the definition of "accidental personal injury" is:

(2) an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of the employment of the covered employee; or

(3) a disease or infection that naturally results from an accidental injury that arises out of and in the course of employment, including:

(i) an occupational disease; and

(ii) frostbite or sunstroke caused by a weather condition.

L.E. § 9–101(b).

### 1. "Arising Out of Employment"

 Arising out of employment "refers to the cause or origin of the accident." *Knoche*, 282 Md. at 455, 385 A.2d 1179. "[T]he injury arises out of employment when it results from some obligation, condition or incident of the employment, under the circumstances of the particular case." *Id.* "The causative danger 'need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence.'" *Id.* at 455–56, 385 A.2d 1179 (quoting *Hill v. Liberty Motor*, 185 Md. 596, 607–08, 45 A.2d 467 (1946)).

> "[I]t is not necessary that there should exist a direct, active, or physical connection between the act causing the accident and the employment, but it is sufficient if the accident, without having for its cause the serious and willful misconduct of the servant, arises directly out of circumstances which the servant had to encounter because of his special exposure to risks that, although external, were incidental to his employment."

*Knoche*, 282 Md. at 456, 385 A.2d 1179 (quoting *Boteler v. Gardiner–Buick Co.*, 164 Md. 478, 482, 165 A. 611 (1933)).

 When determining whether an accident arose out of the employment, Maryland uses the "positional risk test." [7] *Mulready v. University Research Corp.*, 360 Md. 51, 66, 756 A.2d 575 (2000). Under this test, "an injury arises out of employment if it would not have occurred if the employee's job had not required him to be in the place where he was injured." *Id.* at 59, 756 A.2d 575. The positional risk test is essentially a "but for" approach; thus, "an injury is compensable if it would not have happened 'but for' the fact that the conditions or obligations of the employment put the claimant in the

---

7. The "arising out of" language can be analyzed in terms of five scope of risk factors: peculiar risk, the proximate cause approach, increased risk, actual risk, and positional risk. Jordan Yospe, *U.S. Industries v. Director: "Claim" Versus "Condition" in the Analysis of Workers' Compensation Cases*, 12 Am. J.L. and Med. 273, 279–80 (1986).

position where he was injured." John D. Ingram, *The Meaning of "Arising Out of" Employment in Illinois Workers' Compensation Law*, 29 J. Marshall L.Rev. 153, 158 (1995) (hereafter "Ingram"). This is a more liberal standard than the "increased risk test," which most states employ.[8] *Id.* Ingram says:

> An example of the positional risk test is found in *Nippert v. Shinn Farm Construction Company*, [388 N.W.2d 820 (Neb.1986) ], where workers were erecting a shed on a farm. One worker was injured when he was thrown thirty feet by a tornado, whose path was one-half to one-and-one-half miles wide and travelled about fifty-eight miles. The court held that his injury "arose out of" his employment, because his employment duties put him in a position where he would not otherwise have been, which exposed him to a risk, even though the risk was not greater than the risk to the general public. "But for" his employment, he would not have been there to be injured.

*Id.* (footnotes omitted).

> "In determining whether an accident arose out of the employment, the Court 'has endeavored to keep in mind both the legislative mandate that the Workmen's Compensation Act shall be so interpreted and construed as to effect its general social purpose and the concomitant consideration that workmen, like other members of the general public, are not insured against the common perils of life.' "

*Knoche*, 282 Md. at 455, 385 A.2d 1179 (quoting *Sica v. Retail Credit Co.*, 245 Md. 606, 612, 227 A.2d 33 (1967)).

---

8. The increased risk test includes as compensable those risks to which an employee is exposed for longer periods of time than the public, even though to some degree they may be commonly shared by everyone. Jordan Yospe, *U.S. Industries v. Director: "Claim" Versus "Condition" in the Analysis of Workers' Compensation Cases*, 12 Am. J.L. and Med. 273, 281 (1986). *See Mulready*, 360 Md. at 59, 756 A.2d 575 ("The increased risk test requires that 'the employee be exposed to a quantitatively greater degree of risk than the general public.' ") (quoting *Olinger Construction Co. v. Mosbey*, 427 N.E.2d 910, 913 (Ind.Ct.App.1981)).

## 2. "In the Course of Employment"

An injury arises "in the course of employment" when it occurs: (1) within the period of employment, (2) at a place where the employee reasonably may be in the performance of his duties, and (3) while he is fulfilling those duties or engaged in doing something incident thereto. *Knoche,* 282 Md. at 454, 385 A.2d 1179. Pertinent inquiries include: When did the period of employment begin? When did it end? When was its continuity broken? How far did the employee, during the period of employment, place himself outside the employment? *Montgomery County v. Wade,* 345 Md. 1, 11, 690 A.2d 990 (1997); *Proctor–Silex Corp. v. DeBrick,* 253 Md. 477, 480, 252 A.2d 800 (1969). Thus, "in the course of employment" refers to the "place, time and circumstances under which the accident resulting in the injury or death occurs." *Knoche,* 282 Md. at 455, 385 A.2d 1179.

Larson synthesized the "in the course of" cases concerning recreational or social activities by saying that such accidents are within the course of employment when:

(1) They occur on the premises during a lunch or recreation period as a regular incident of the employment; or

(2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or

(3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life.[9]

4 Arthur Larson, *Workers' Compensation Law* § 22.01 (2001).

Larson's synthesis, hereafter referred to as the "Larson Rule," has been quoted previously with approval by the Court

---

9. Larson notes that several states have specific statutory provisions addressing the type of recreational and social activities that are covered, and narrowing the scope of coverage. 4 Arthur Larson, *Workers' Compensation Law* § 22.02 (2001). These states are: California, Colo-

of Appeals and by this Court. *See Sica v. Retail Credit Co.*, 245 Md. 606, 613, 227 A.2d 33 (1967); *Turner v. State Office of the Public Defender*, 61 Md.App. 393, 403, 486 A.2d 804 (1985). The Rule consists of three independent parts. In Larson's words, if at least one is found, "the absence of the others is not fatal." 4 Arthur Larson at § 22.03(1). Application of the Larson Rule to the case at hand would spell defeat for Smith because none of the three factors is here present.

In the area of company picnics and parties, when the degree of employer involvement descends to mere sponsorship or encouragement, Larson states that "the questions [of compensability] become closer, and it becomes necessary to consult a series of tests bearing on work-connection." *Id.* at 22.04[3]. Among the questions to be asked are:

Did the employer in fact sponsor the event? To what extent was attendance really voluntary? Was there some degree of encouragement to attend in such factors as taking a record of attendance, paying for the time spent, requiring the employee to work if he did not attend, or maintaining a known custom of attending? Did the employer finance the occasion to a substantial extent? Did the employees regard it as an employment benefit to which they were entitled as of right? Did the employer benefit from the event, not merely in a vague way through better morale and good will,

---

rado, Illinois, Massachusetts, Michigan, Montana, Nevada, New Jersey, New York, and Oregon. *Id.*

The narrowest statute appears to be that of Nevada, in which participation in recreational and social events is excluded from coverage unless the worker is actually paid for participating. *Id.* The Illinois statute similarly tightens such coverage, requiring the employer to have ordered participation, whether employer has paid part or all of the cost. *Id.* California's test is the least extreme, turning mainly on whether the activity was reasonably expected or expressly or impliedly required. *Id.*

but through such tangible advantages as having an opportunity to make speeches and awards?

*Id.*

### B. *Maryland Off–Premises Recreational Cases—Company Picnics and Company Parties*

In *Sica,* 245 Md. at 606, 227 A.2d 33, an employee (Sica) was seriously injured when he dove into shallow water at his employer's annual picnic. *Id.* at 611, 227 A.2d 33. The picnic, as well as the employees' Christmas party, were touted in Sica's pre-employment interview as fringe benefits of his employment. *Id.* at 609, 227 A.2d 33. The picnic was organized by a committee of employees with the authorization of the employer's managers. *Id.* The cost of the picnic was paid for by the employer, and employees were urged by the employer to attend, although attendance was not compulsory. *Id.* at 610, 227 A.2d 33. On the date Sica was injured, the picnic was held about thirty miles from where Sica usually worked. *Id.*

In *Sica,* the trial court ruled that Sica's injuries did not arise out of or in the course of his employment. *Id.* at 611, 227 A.2d 33. The Court of Appeals reversed, *id.* at 621, 227 A.2d 33, holding that the third factor in the Larson Rule had been proven, *i.e.,* that the "employer derived substantial direct benefit from the [picnic] activity beyond the intangible value of improvement in employee health and morale common to all kinds of recreation and social life." *Id.* at 618, 227 A.2d 33. Thus, Sica was entitled to compensation for his injury.[10]

---

10. *Sica* quotes with approval language used in *Moore's Case,* 330 Mass. 1, 110 N.E.2d 764 (1953). *Sica,* 245 Md. at 614, 227 A.2d 33. The five *Moore* factors are: "(1) The customary nature of the activity, . . . (2) The employer's encouragement or subsidization of the activity, . . . (3) The extent to which the employer managed or directed the recreational enterprise, . . . (4) The presence of substantial pressure or actual compulsion upon the employee to attend and participate, . . . (5) The fact that the employer expects or receives a benefit from the employee's participation in the activity, whether by way of improved employer-employee relationships . . . through greater efficiency in the performance of the employee's duties. . . ."

In *Coats & Clark's Sales Corp. v. Stewart,* 39 Md.App. 10, 383 A.2d 67 (1978), we considered whether an employee's (Stewart's) injuries, sustained on a trip to the grocery store to purchase food for a baby sitter "arose out of and in the course of his employment." *Id.* at 14, 383 A.2d 67. The babysitter was needed so that Stewart and his wife could attend a dinner party to honor two employees with whom Stewart worked. *Id.* at 11, 383 A.2d 67. Stewart was to present a gift to one of the honored employees at the dinner party. *Id.* The party, scheduled to begin at 6:00 p.m., was to be held at a co-employee's home, and was paid for by the employer. *Id.* At 5:00 p.m., while driving an automobile provided by his employer, Stewart was fatally injured in an accident. *Id.*

The trial court determined that the company-sponsored dinner party was sufficiently work related to be an incident of Stewart's employment. *Id.* at 17, 383 A.2d 67. We agreed, saying:

> In our view, the task of obtaining food for a baby sitter is a reasonable and necessary incident to obtaining a baby sitter's services. Because that task would not have been undertaken except for the obligation of employment, it, like the task of transporting the baby sitter, is an integral component of an employee's attendance at a work-related social event. Accordingly, we hold that an employee's self-contained trip to obtain food for a baby sitter needed to enable him to attend a work-related social event is a special errand or mission. Therefore, an employee's injury sustained during such a trip is one sustained in the course of

Although none of the *Moore* factors is alone decisive, with the possible exception of employer compulsion, *Turner v. State, Office of the Public Defender,* 61 Md.App. 393, 404, 486 A.2d 804 (1985), here none of the five factors appear to favor Smith.

his employment and is compensable.[11]

*Id.*

## C. *On–Premises Coffee and Lunch Break Cases*

It has been repeatedly and consistently observed that in borderline course-of-employment situations, such as going and coming, or having lunch, the presence of the activity on the premises is of great importance.... Accordingly, it should not be necessary, in the typical case of injury during a noon-hour ball game on the company's ball diamond or in its gymnasium to bolster the case by adding proof of employer sponsorship of the activity or employer benefit therefrom. It is generally held sufficient that the activity is an accepted and normal one, since it thereby becomes a regular incident and condition of the employment.

4 Arthur Larson, *Workers' Compensation Law,* § 22.03[1] (2001).

In *Mack Trucks, Inc. v. Miller,* 23 Md.App. 271, 326 A.2d 186 (1974), an employee of Mack Trucks ruptured a kidney during a lunch break while playing touch football on a plot of land owned by the employer and located near the plant where the employee worked. *Id.* at 272, 326 A.2d 186. Football had not been expressly authorized by Mack Trucks, but the employer's safety director had been a spectator at previous games—which had been going on for three months prior to the claimant's injury. *Id.* Judge Lowe, for this Court said:

Not only do the employer's actual knowledge and acquiescence establish the recreational activity as an "incident of employment," but the period over which it had persisted would, itself, permit that inference. 1 Larson's *Workmen's*

---

11. Courts in at least some sister states would apparently take a different view from that espoused in *Sica* and *Coats and Clark's Sales Corp.*, both *supra.* *See, e.g., Anderson v. Custom Caterers, Inc.,* 279 Ala. 360, 185 So.2d 383 (1966) (employee at an on-premises company sponsored Christmas party who was injured while dancing was held not to have received a compensable injury even though party was held to promote better employer-employee relations and with the expectation that the employer would benefit in the form of happier and more satisfied employees).

*Compensation,* § 22.12; citing *Moore's Case,* 330 Mass. 1, 110 N.E.2d 764, analyzed and relied upon in *Sica.*

The language of Judge Oppenheimer justifying the *Sica* result seemed to augur the circumstance here. He gave an illustrative example of a social activity or event that would be sufficiently work-related to be an incident of employment.

> "The modern institution of the 'coffee break' benefits the employer, in maintaining the employees' morale, as well as the participating employees. There can be little question but that an accident sustained during such an interval on the portion of the employer's premises set aside for that activity arises out of the employment." *Sica v. Retail Credit Co.,* 245 Md. at 612, 227 A.2d 33.

*Id.* at 274, 326 A.2d 186.

*Mack Trucks* fits within part one of the Larson Rule. Unlike the case at hand, however, the injury occurred within working hours.

In *King Waterproofing Co. v. Slovsky,* 71 Md.App. 247, 524 A.2d 1245 (1987), Slovsky was struck by a car while crossing a highway. *Id.* at 249, 524 A.2d 1245. Slovsky was working a four-hour shift from 4:00 p.m. to 8:00 p.m. on the day of his injury. *Id.* At 6:30 p.m., during a paid meal break, he was struck while going to a carry-out restaurant located across a public highway from his office. *Id.* The Commission found that Slovsky's injury arose out of and in the course of his employment, and on appeal, the trial court agreed and granted summary judgment in favor of Slovsky. *Id.* at 251–52, 524 A.2d 1245.

This Court framed the issue for consideration as whether the employee sustained an accidental injury while engaged in some personal comfort activity incidental to his employment. *Id.* at 253, 524 A.2d 1245. We likened the facts of the case to prior cases where courts had said, in *dicta,* that an injury sustained during a coffee break on the employer's premises is

deemed to have arisen out of the employment. *Id.* (citing *Mack Trucks, Inc., supra,* and *Sica, supra.*)

The *Slovsky* Court reasoned:

If an injury that occurs during an on-premises coffee break can arise out of employment, in the sense that it results from an incident of the employment, it follows that an injury sustained during an off-premises coffee break also can arise out of employment. There would appear to be a greater likelihood, however, that an employee who leaves his employer's premises during a coffee break or rest break may depart from the course of his employment. In regard to the compensability of injuries sustained during off-premises coffee breaks, Professor Larson writes:

It is clear that one cannot announce an all-purpose "coffee break rule," since there are too many variables that could affect the result. The duration might be five minutes, seven minutes, 10 minutes, or even 20 minutes by which time it is not far from that of a half-hour lunch period. Other variables may involve the question whether the interval is a right fixed by the employment contract, whether it is a paid interval, whether there are restrictions on where the employee can go during the break, and whether the employee's activity during this period constituted a substantial personal deviation.

*Id.* at 253–54, 524 A.2d 1245 (quoting 1 Arthur Larson, *Workmens' Compensation Law* § 15.54, at 4–116.38 to .40 (1985) (footnotes omitted)). The Court continued:

We do not find the circumstances of the instant case to be significantly distinguishable from those in *Maryland Casualty Co. v. Insurance Co. of North America,* 248 Md. 704, 238 A.2d 88 (1968). There, the Court of Appeals held that an injury sustained by an employee of a racing stable occurred in the course of employment where the employee was injured while en route by automobile to a restaurant near the race track to have coffee. The employee in *Maryland Casualty* was on call around the clock and was paid on that basis. Although there was a cafeteria located at the race track, the record indicated that it was located at such a

distance from the employee's work area that a car was considered necessary to get there and return in a reasonable time. The Court relied on these facts, "coupled with the knowledge of the employer that his employees frequently left the track for coffee and meals and that they did so with his approval," in concluding that the injured employee was "within the course of his employment" at the time of his injury. 248 Md. at 708, 238 A.2d 88. In the case *sub judice,* as in *Maryland Casualty,* the employee left his employer's premises, with the employer's tacit consent, to obtain refreshments that were unavailable on the premises. The fact that the employee in *Maryland Casualty* was "on call," and therefore arguably within his employer's control, is of no practical significance since that employee probably could not have returned to his place of employment, when summoned, in less than 20 minutes, the established duration of the break in the instant case.

The appellants argue that it was unnecessary for the appellee to leave the employer's premises to obtain refreshments because the employer provided such items as coffee and instant soup mixes on the premises. The fact that the employer may have provided certain refreshments, however, does not support an inference that employees were not permitted to leave the premises, given the employer's acquiescence in that practice. Moreover, the limited fare available on the premises did not satisfy those who, like the appellee, preferred a cold drink. Under all the circumstances, the appellee, at the time he was injured, was reasonably engaged in ministering to his personal comfort, and his conduct did not constitute a departure from the course of his employment.

*Id.* at 255–56, 524 A.2d 1245.

*Slovsky,* like *Mack Trucks,* is distinguishable from the case *sub judice* in that the injury occurred during working hours.

## D. *On–Premises Recreation Cases*

When seeking for a link by which to connect an activity with the employment, one has gone a long way as soon as one

has placed the activity physically in contact with the employment environment, and even further when one has associated the time of the activity somehow with the employment. This done, the exact nature and purpose of the activity itself does not have to bear the whole load of establishing work connection, and consequently the employment-connection of that nature and purpose does not have to be as conspicuous as it otherwise might. Conversely, if the recreational activity takes place on some distant vacant lot, several hours after the day's work has ceased, some independently convincing association with the employment must be built up to overcome the initial presumption of disassociation with the employment established by the time and place factors.

4 Arthur Larson, *Workers' Compensation Law* § 22.03 (2001).

Time and place, two overt physical indicia of course-of-employment, are strong factors identifying an activity with the employment. *Id.* at § 22.04(4)(b).

If both [time and place] are present, that is, if the game is played on the premises during a lunch or recreation period, compensability has been seen to be clear. But even if only one of the two elements is present, the case has made a very strong start. Thus, if the game is played outside hours, the fact that it is played on the premises is a heavy, although not necessarily decisive, weight on the side of coverage, and may offset a serious deficiency in some other component of the case."

*Id.*

Here, as discussed, *infra*, Smith made "a good start" in showing compensability by proving that his injury occurred on his employer's premises. The question then becomes, did he produce enough other evidence to allow a fact-finder to conclude that his accident arose out of *and* in the course of his employment.

Smith relies heavily on *Austin v. Thrifty Diversified, Inc.*, 76 Md.App. 150, 543 A.2d 889 (1988), in support of his compensability argument. In *Austin*, the parents of John Austin

("John") brought a tort claim against John's employer for their late son's wrongful death. *Id.* at 152, 543 A.2d 889. The issue presented was whether the exclusive remedy for John's parents was under the Workers' Compensation Act. *Id.* at 151–52, 543 A.2d 889. The answer to that question depended on whether John's death arose out of and in the course of his employment with Thrifty Diversified, Inc., t/a Better Engineering ("Thrifty"). *Id.*

John worked for Thrifty as a welder. *Id.* at 153, 543 A.2d 889. On the date of his fatal injury, he received permission to use his employer's welding equipment to repair a friend's automobile exhaust system. *Id.* Shortly after John's shift ended, while still on his employer's premises and while working on his friend's exhaust system, John was electrocuted by faulty welding equipment supplied by Thrifty. *Id.*

In *Austin*, the trial judge granted summary judgment in favor of Thrifty on the ground that John's death arose out of and in the course of his employment, and as a consequence, John's parents' exclusive remedy was under the Workers' Compensation Act. *Id.* at 156, 543 A.2d 889. We affirmed, *id.* at 165, 543 A.2d 889, saying:

> In the instant case, the deceased's death "would not have ensued if it had not been for the employment"; it was only because the deceased was an employee of appellee that he was permitted to use appellee's equipment, on appellee's premises, for a personal project. Moreover, *the instrumentality of the death, the place where it happened, and the activity giving rise to it* were the same as those he encountered in his employment; hence, it may be said that the death was brought about by the hazard of the employment. Under these circumstances, it may not be seriously contended that the death did not arise out of the deceased's employment.

*Id.* at 159, 543 A.2d 889 (emphasis added).

Turning to the issue of whether Austin's injuries arose "in the course of employment," the *Austin* Court found instructive cases dealing with employees injured or killed while engaged

in picnics and other company sponsored social activities. *Id.* at 159–61, 543 A.2d 889. The *Austin* Court noted that an important factor in those cases was whether the employer gained anything from the employee's recreational endeavor. *Id.* at 160, 543 A.2d 889. The *Austin* Court quoted from the New Jersey Supreme Court case of *Ricciardi v. Damar Products Co.,* 45 N.J. 54, 211 A.2d 347, 349 (1965), as follows:

> We think it clear the picnic was sponsored by the employer in part at least to further its own interests. That the employees were free to attend or to stay away is not a critical fact. Nor is it decisive that wages were not paid those who did appear, ... or that the picnic was held at a place other than the work premises. Rather[,] the question is whether the event is sufficiently work-connected to bring employees within coverage of the compensation law, a law which provides protection for employees, not because of fault or failure of the employer, but rather upon the belief that the enterprise itself should absorb losses which inevitably and predictably are an incident of its operation.
>
> Where, as here, the employer sponsors a recreational event for the purpose of maintaining or improving relations with and among employees, the employees gratify the employer's wish by attending and thus serve the employer's business aim. It therefore is correct to say the Legislature intended the enterprise to bear the risk of injuries incidental to that company event. Hence the picnic itself was a covered affair. (Citations omitted)....

*Id.* at 160, 543 A.2d 889.

Later, the *Austin* Court concluded:

> In the instant case, we are not concerned with an employer sponsored social or recreational activity; rather, we are concerned with an employer's policy of allowing employees to work on personal projects on its premises, using its tools, after the work day has ended. Nevertheless, the ... [*Sica v. Retail Credit Co.,* 245 Md. 606, 227 A.2d 33 (1967), and *Coats and Clark's Sales Corp. v. Stewart,* 39 Md.App. 10, 383 A.2d 67 (1978) ] analysis, to the extent that it focuses on

the benefit expected by, or accruing to, the employer, is equally applicable to the case *sub judice.* The benefit expected by, or accruing to, the employer as a result of allowing personal projects to be done using its equipment and on its premises is no different than that flowing to the employer as a result of its sponsorship of recreational or social events.

*Id.* at 161–62, 543 A.2d 889.

As in *Austin,* here Smith's employer may have derived some intangible good will by tolerating, but not encouraging, on-premises after-hours activity. But the subject case is nevertheless distinguishable from *Austin* by the fact that, in *Austin,* John's after-hours injury bore a direct relationship to the work he did during the day. John was paid to weld, and he was hurt welding, as a direct result of defective equipment supplied by his employer. By contrast, here, no defective equipment was supplied by the County, and Smith was not paid to play basketball.

In *McNamara v. Town of Hamden,* 176 Conn. 547, 398 A.2d 1161 (1978), the Supreme Court of Connecticut considered whether an injury sustained while an employee was playing ping-pong on his employer's premises arose out of and in the course of his employment. *Id.* at 1163. The claimant's work day was from 8 a.m. to 4:30 p.m. *Id.* Approximately eighty of the claimant's co-employees were in the habit of assembling at their employer's garage before work about 7:30 a.m. every day. *Id.* Several months prior to the date of injury, this group of employees received permission from the employer to purchase a ping-pong table and accessories at the employees' own expense, and to install the table in the garage. *Id.*

The employer limited the ping pong playing time to 7:30 a.m. to 8 a.m., from noon to 12:30 p.m. (lunch time), and from 4 p.m. until 4:30 p.m. *Id.* At 7:55 a.m. on the date he was injured, the claimant tripped and fell while playing ping-pong; he claimed workmen's compensation benefits for lost time from work and medical expenses due to his fall. *Id.*

The Connecticut workers' compensation commissioner concluded that the injury was not compensable because no benefit accrued to the employer from the employees playing ping-pong, that the table was for the exclusive use and benefit of the players, and that ping-pong was not an incident of the plaintiff's employment or closely enough connected with it to require compensation. *Id.* The claimant appealed to the Court of Common Pleas, which dismissed the appeal on the ground that the claimant had not met his burden of proving that the injury "arose out of the employment and occurred in the course of the employment." *Id.*

The Supreme Court of Connecticut, having determined that the trial court and commissioner implicitly treated the injury as one "arising out of" the employment, focused its inquiry on the "in the course of" employment aspect of the case. *Id.* at 1164. The court held that in order to come within the course of employment requirement, "an injury must occur (a) within the period of the employment; (b) at a place the employee may reasonably be; and (c) while the employee is reasonably fulfilling the duties of the employment or doing something incidental to it." *Id.*

As to part (a) of the test, the *McNamara* court determined that plaintiff was "within the period of employment," even though he was injured five minutes prior to the commencement of the official work day. *Id.* The court opined, "[t]he exact time is not significant, so long as the employee is on the premises reasonably close to the start or finish of the work day." *Id.* With respect to part (b) of the test, the court concluded that plaintiff was "at a place he could reasonably be," as plaintiff was on the premises just before the start of the work day.

With regard to whether plaintiff's activity was "incidental to his employment," the *McNamara* court stated that "[t]he meaning of the term 'incidental' need not be defined as compulsion by or benefit to the employer in all cases." *Id.* at 1165. The court, foreseeing difficulty with a uniform application of an employer benefit rule, asked rhetorically, "How can

one realistically evaluate the actual benefit an employer receives from permitting on-premises recreational activities?" *Id.* The court continued: "The obvious difficulty in drawing such distinctions or weighing such intangibles is sufficient reason to adopt a new rule which will avoid arbitrary and unjust results." *Id.* Citing Professor Larson's analyses of recreation, personal comfort, and horseplay cases where employer-sanctioned activity regularly occurs on the premises, the court said that it should not be necessary "to bolster the case by adding proof of employer sponsorship of the activity or employer benefit therefrom. It is generally held sufficient that the activity is an accepted and normal one, since it thereby becomes a regular incident and condition of the employment." *Id.* at 1165–66 (citing 1A Larson, op. cit. § 22.11, p. 5–72 (1978)).

Given that the employer sanctioned the ping-pong games by regulating permitted playing times, by allowing equipment on the premises, and by setting aside actual work hours in the afternoon for the activity, and that the games occurred regularly on the employer's premises, the court held that sufficient facts existed upon which to conclude that the games were an incident of the employment. *Id.* at 1166. The court concluded by outlining a rule for determining whether an activity is incidental to employment: "If the activity is regularly engaged in on the employer's premises within the period of the employment, with the employer's approval or acquiescence, an injury occurring under those conditions shall be found to be compensable." *Id.*

The rule enunciated in *McNamara* would not benefit Smith, because his recreational activity was not shown to have been engaged in "within the period of employment," nor was basketball regularly engaged in by co-employees within the period of their employment.

In *Nazario v. New York State Department of Correction,* 86 A.D.2d 914, 448 N.Y.S.2d 531 (N.Y.App.Div.1982), the court summarized the facts surrounding a prison guard's injury in a softball game thusly:

Claimant's team was comprised exclusively of coemployees and was managed by a sergeant at the facility. Participation was voluntary. Claimant testified that the essential purpose of the team was to promote employee morale. He further stated that written application to the superintendent of the institution was necessary for approval to use the field. The employer acquiesced in the use of its name on T-shirts worn by team members, but it does not appear that the employer provided financial support. Game scores and schedules were posted on the employer's bulletin board. The [workers' compensation] board, in reversing the referee's determination denying the claim, stated: "Upon review, a Majority of the Panel finds, based on the entire record and in particular, the claimant's testimony, that the claimant did, on May 26, 1978, sustain an accident within the meaning of the Workers' Compensation Law with resulting causally related disability."

*Id.* at 914, 448 N.Y.S.2d 531.

On appeal, the *Nazario* court affirmed in a succinct, but not terribly helpful, opinion:

The determination of whether claimant's accident arose out of and in the course of employment presents a factual question for the board. Pertinent herein is the fact that the employer could terminate the athletic activities on its premises at will. Moreover, it is not insignificant that the activity benefited [sic] employer-employee relations. In our view, there is substantial evidence to sustain the determination of the board. The essential nexus between the softball game and the employer has been established. Decision affirmed, with costs to the Workers' Compensation Board.

*Id.* at 915, 448 N.Y.S.2d 531 (citations omitted).

In the case at hand, as in *Nazario,* the County could have terminated basketball play by its employees if it had wanted to do so. But here, no proof was presented that the County allowed the recreational activity in order to "benefit[ ] employee-employer relations...." *Id.*

In *Clark v. Chrysler Corporation,* 276 Mich. 24, 267 N.W. 589 (1936), Clark, a Chrysler plant police officer, was injured while playing basketball in the gymnasium at Chrysler's plant. *Id.* at 589. A few minutes after Clark's shift ended, he began playing basketball on his employer's premises. About twenty-five minutes later, he slipped on the floor, hurting his knee. *Id.* at 590.

Clark and his co-employees bought their own gym clothing and shoes as well as the basketballs used. Sometime prior to Clark's accident, another police officer read a letter aloud to a group of patrolmen who planned to use the gymnasium. The letter was from a Chrysler executive exhorting officers to use the gym "to develop and build up their bodies." *Id.* at 590.

The deputy Workers' Compensation Commissioner denied compensation, but on appeal the Michigan Department of Labor and Industry entered an order awarding compensation to Clark. *Id.* at 590. The Supreme Court of Michigan reversed the order, stating that "[i]ndustry must take care of its disabled, but optional gymnasium exercises cannot be said to be a part of employment so that a common mishap in indulgement is an injury arising out of and in the course of employment." *Id.* at 589. The court went on to say:

> The employer provided a place for recreation of employees and left the method and means of enjoyment to the will of each individual. It may be true that the benefit derived by a user of the place not only tended to improve him physically but, as well, to create a more friendly relation between employer and employee, but such physical betterment and emotional result, while desirable, do not attach to the contract of employment.

*Id.* at 589–90.

In *Keystone Steel & Wire Co. v. Industrial Commission,* 40 Ill.2d 160, 238 N.E.2d 593 (1968), the claimant was a steel-mill recorder, who participated in an organized softball game, an activity commonly engaged in by co-employees. *Id.* at 593–94. The claimant broke his leg while sliding into third base. *Id.* at 593. The injury occurred on land managed and controlled by

the employer after the claimant had completed his day's work. *Id.* at 594. The employees sponsored the softball game and paid for equipment, bases, services of umpires, and a trophy awarded at the end of the season. *Id.* at 593. Employee-patronized canteens located throughout the plant provided additional financial support. *Id.* The employees made up their own game schedule, which was posted on bulletin boards throughout the plant and results of games were published in a plant newspaper. *Id.* at 593–94.

Claimant filed a workmen's compensation claim, and an award by the Industrial Commission was confirmed by the trial court. *Id.* at 593. The employer appealed, contending the injury did not arise out of claimant's employment. *Id.* The Supreme Court of Illinois agreed with the employer. *Id.* at 595. The court said that it did not believe the scope of employment could be stretched to include the softball game in which claimant was injured. *Id.* at 594. The court continued:

> [T]he company in the case at bar exerted no pressure or encouragement for participation and derived no advertising benefit from the games. Moreover the company did not sponsor the event, nor was it held during regular working hours.... The ball game was solely for the recreation and personal diversion of the employees, without any substantial business advantage to the company. Whatever improvement may have resulted in morale or employee-employer relations is far too tenuous to provide a basis for saying the injury was sustained either out of or in the course of the employment.
>
> Nor is it of importance on this issue that the company acquiesced in the activities, provided the use of its land for the ball diamond, permitted the canteen machines to be located in the plant, and allowed employees to trade shifts in order to play. All the company did, in essence, is to cooperate in enabling employees to engage in social and recreational activities on their own time. To hold that such gratuitous contributions entail liability without fault for injuries at play penalizes the mere providing of benefits and will most certainly tend to discourage it. Facts such as

those in this case are totally insufficient to convert this recreational activity into an incident of employment. However different the views may have become after the event, it is hardly likely that either the company, or the employee, or anyone else engaged in or watching the game then thought that it was part of the employment or that the claimant was on the job at the time. He was not hired as a ballplayer but as a factory worker, and his hours of work having ended for the day the only reasonable inference under the circumstance is that he was no longer in the course of his employment.

*Id.* at 594–595.

The claimant in *Taylor v. Bi–State Development Agency,* 416 S.W.2d 31 (Mo.Ct.App.1967), was a bus driver who had finished his shift and was in the recreation room provided by his employer when, while watching a pool game, another employee nudged him, and caused him to fall. *Id.* at 33. Although all employees in the room were off-duty, there were occasions when emergencies arose, and employees available in the recreation room would be called upon, on a voluntary basis, to help out. *Id.*

The Industrial Commission of Missouri found that Taylor's injury was compensable because "the maintenance of the recreation room was an incident of the employment and that [the operation of the recreation room] resulted in a substantial benefit to both the employer and employee." *Id.* The Missouri Court of Appeals, citing the Missouri Supreme Court's decision in *Lampkin v. Harzfeld's,* 407 S.W.2d 894, 897 (Mo. 1966), disagreed:

An injury arises 'out of' the employment when there is a causal connection between the conditions under which the work is to be performed and the resulting injury, and it arises 'in the course of' the employment when it occurs within the period of the employment at a place where the employee may reasonably be and while he is reasonably

fulfilling the duties of his employment or engaged in doing something incidental thereto.

*Id.* at 34.

The court found no evidence to support the conclusion that the accident occurred during the course of claimant's employment. *Id.* at 35. It further found no evidence that claimant was engaged in a duty of his employment or an activity incidental to it. *Id.*

In *Mullins v. Westmoreland Coal Co.,* 10 Va.App. 304, 391 S.E.2d 609 (1990), a case strongly relied upon by the County in the case at bar, an employee was injured while playing basketball on the employer's premises before his work shift started. *Id.* at 610. The Virginia Industrial Commission denied employee benefits, and the Court of Appeals of Virginia affirmed that decision, finding that the injury did not arise out of the employment. *Id.* In *Mullins,* the court said: "If the employment exposes the worker to the activity which causes the accident, the accident generally will be deemed to have arisen out of the employment.... However, the claimant must show a causal connection between the injury and the conditions under which the employer requires the work to be done." *Id.* at 611. "When a claimant 'incurs dangers of his own choosing which are altogether outside of any reasonable requirement of his position, the risk arising from such action is not incident to and does not arise out of the employment.'" *Id.* (citing *Conner v. Bragg,* 203 Va. 204, 123 S.E.2d 393, 397 (1962)).

While much of the language used in *Mullins* appears to be relevant to the issue we must decide, the case is not entirely apposite because it is evident that the court's decision was strongly influenced by the fact that, one week before claimant's accident, the employer put up a sign near the basketball court that read, "Shooting only, no one on one." When the claimant was injured, he was not merely shooting baskets; he was playing "two on two." *Id.* at 610.

## E. *Decision*

### 1. "Arising Out of Employment"

█ As noted earlier, Maryland uses the "positional risk test" to determine whether an injury arises out of employment. *Mulready v. University Research Corp.*, 360 Md. 51, 66, 756 A.2d 575 (2000). An injury arises out of the employment if it would not have occurred but for the fact that the employee's job required the employee to be in the place where he was injured. *Id.* Smith does not meet this test because his job did not require him to be on the basketball court where he was injured.

### 2. "In the Course of Employment"

█ Whether Smith's injury arose in the course of employment depends upon whether the injury occurred (1) within the period of employment, (2) at a place where the employee reasonably may be in the performance of his duties, and (3) while he is fulfilling those duties or engaged in doing something incident thereto. *Knoche v. Cox*, 282 Md. 447, 454, 385 A.2d 1179 (1978); *see also Montgomery County v. Wade*, 345 Md. 1, 11, 690 A.2d 990 (1997).

Smith's injury occurred after his day's work was finished and thus was not within the period of his employment. He did not work in the gymnasium, and therefore he was not injured at a place where he would reasonably be expected to be in the performance of his duties as a guard. He clearly was not fulfilling work-related duties at the time he injured himself. Whether he was engaged in activities "incident to his duties" is a separate question.

Smith asserts in his affidavit that he was playing basketball "to maintain the high level of physical fitness required to be a correctional officer." Counterbalancing this is the undisputed fact that employees were not instructed or encouraged to participate in sports at the gymnasium to maintain fitness.

In our view, Smith's post hoc subjective reason for playing basketball on the date of injury is too weak a reed to support

the argument that his recreational activities were "incident" to his job as a prison guard. To keep in shape, he could have exercised virtually anywhere. As the Supreme Court of Illinois said in the *Keystone Steel & Wire Co.* case,

> [h]owever different the views may have become after the event, it is hardly likely that either the [employer], or the employee, or anyone else engaged in or watching the game then thought that it was part of the [claimant's] employment or that the claimant was on the job at the time.

238 N.E.2d at 594. Smith was not hired to play basketball, and the only reasonable inference to be drawn from the fact that his hours of work had ended for the day is that he was no longer in the course of employment. We hold, using the test set forth in *Knoche v. Cox*, 282 Md. at 454, 385 A.2d 1179, that his injury did not arise within the course of his employment.

The result would be the same using the Larson Rule approved by the Court of Appeals in *Sica.* 245 Md. at 613, 227 A.2d 33. Appellee's injury did not occur on the premises during a lunch or recreation period. And, Montgomery County did not bring the activity of playing basketball into the orbit of Smith's employment by expressly or impliedly requiring participation in the activity or by making the activity part of Smith's services. Lastly, Montgomery County did not derive substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life.

It will be recalled that the motions court found that "it is a benefit to the employer in the special situation of a detention center to have extra guards so near and available in case there is a problem." Even if we were to assume that this were true, there was no evidence that the County knew, on the date in question, that officers were in the gym ready to be called upon in case of emergency. And, in any event, this sort of indirect benefit is insufficient to fit the recreational activity into the third "link" of the Larson Rule.[12]

---

**12.** In his brief, Smith never argued that any direct benefit was received by the County by allowing employees to play basketball beyond the

As stated in *Keystone, supra:* "Whatever improvement may have resulted in morale or employee-employer relations is far too tenuous to provide a basis for saying the injury was sustained either out of or in the course of the employment." *Keystone*, 238 N.E.2d at 594. The Supreme Court of Michigan arrived at a similar conclusion in *Clark v. Chrysler Corp., viz:*

> It may be true that the benefit derived by a user of the place not only tended to improve [the employee] physically but, as well, to create a more friendly relation between employer and employee, but such physical betterment and emotional result, while desirable, do not attach to the contract of employment.

267 N.W. at 589–90.

### III. CONCLUSION

In mathematics, there is a rule of inverse relationships, *i.e.,* if A + B = X (the greater A, the lesser B, and vice versa). Similarly, in deciding whether an injury is compensable, we apply a rule of inverse relationships. The stronger the facts are to show that an injury "arose out of employment," the more relaxed the requirement that the injury be shown to be "in the course of employment" and vice versa. In this case, however, appellee's injury was not shown to meet either element of the formula.

Taking all facts (along with all inferences that can be reasonably drawn from those facts) in the light most favorable to Smith, summary judgment should not have been entered in his favor; instead, the circuit court should have entered summary judgment in favor of the County.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS TO ENTER JUDGMENT IN FA-**

---

intangible value of improvement in employee morale. In any event, such an argument would have not have been supported by the record.

VOR OF APPELLANT; COSTS TO BE PAID BY APPEL-LEE.